UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW DESHONE,

        Petitioner,               Case Number: 2:11-CV-13833
                                                  HON. LAWRENCE P. ZATKOFF

v.

THOMAS MACKIE,

        Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Petitioner Matthew Deshone has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, who is currently incarcerated at the Kinross Correctional Facility in Kincheloe, Michigan, challenges his convictions for first-degree felony murder, first-degree premeditated murder, two counts of possession of a firearm during the commission of a felony, carrying a concealed weapon, carrying a dangerous weapon with unlawful intent, and falsely reporting a felony. Petitioner raises four claims for habeas relief. For the reasons set forth, the Court denies the petition.

### I. Background

Petitioner's convictions arise from the shooting deaths of two men in Saginaw on November 1, 2005. The Michigan Court of Appeals set forth the relevant facts as follows:

> Deshone's convictions arose out of the shooting deaths of Demario Sherman and Franscoir Shepherd. At trial, the most significant evidence against Deshone came from an accomplice, Joseph Villarreal, who had earlier pleaded guilty to two counts of second-degree murder and falsely reporting a felony arising from the same events.
>
> Villarreal testified that he had known Deshone for a month or two by the time of the

events at issue and was dating Deshone's sister, Michelle. Villarreal said he drove his mother's car, a white 1992 Chevy Lumina, over to Deshone's house and joined Deshone's family for trick-or-treating on October 31, 2005. After trick-or-treating, Villarreal, Deshone and Deshone's sister, Rebecka, went to a local store to purchase cat food. Rebecka testified that she overheard Villarreal talking to someone on the phone concerning the sale of cocaine during the trip to the store. She said that she told Deshone that she was going to tell their mother and Villarreal or Deshone told her to "shut up" and the other told her to mind her own business. She stated that Deshone appeared to know about the cocaine deal.

Villarreal stated that he knew Sherman and that Sherman had asked him several days earlier about finding someone who could sell him an ounce of cocaine. Villarreal said he asked Deshone about finding the cocaine for Sherman and that Deshone responded that he would look into it.

After they purchased the cat food, Villarreal said they went back to Deshone's house. Later, Deshone and Villarreal drove to the home of Gerald Williams. Villarreal said that Deshone introduced him to Gerald and that he had only met him once before that day. At some point Shepherd also arrived at Gerald's home. Villarreal stated that they all drank and the others began to smoke marijuana while he did some "coke." They then left and went to Freddie Williams' house and stayed there until Freddie arrived home. Villarreal said that Freddie was Gerald's brother and that he met Freddie for the first time on that night.[1] When Freddie arrived he was with another man, whose name Villarreal could not remember. Villarreal referred to him as the man with braids.

At Freddie's house, Deshone approached Villarreal and asked him if his friend still wanted the ounce of cocaine. Villarreal then called Sherman and arranged the sale. Villarreal said that he left with Deshone and the man with braids to go sell the cocaine to Sherman. The man with the braids drove Villarreal's car and provided Villarreal with the cocaine. When they arrived at Sherman's apartment, Deshone and Villarreal went in to meet Sherman while the man with the braids remained in Villarreal's car.

Villarreal testified that they met Sherman in the hallway outside Sherman's apartment. Villarreal showed Sherman the cocaine and Sherman showed them a bundle of money wrapped with a rubber band. Villarreal stated that Sherman wanted to weigh the cocaine, but that Deshone then pulled a gun from the pouch of his hoodie and told Sherman to "run that shit," which is street talk for give me the money. After Sherman responded, "forget ya all," Deshone shot Sherman twice. The medical examiner testified that Sherman died from two gun shot wounds; one shot to Sherman's chest and one shot through his right eye.

Villarreal said that they got scared and ran from the apartment without taking

2

Sherman's money. Sherman's mother testified that she heard the shots and came out into the hallway and saw her son dead with a roll of money next to him. Villarreal stated that they returned to the car where the man with the braids was waiting. Villarreal said he was panicky and that the man with braids told him to calm down. Villarreal then gave the man with braids the cocaine and they drove back to Freddie's house.

Villarreal said that Gerald, Freddie and Shepherd were at Freddie's house when they returned. Villarreal sat in Freddie's garage while Gerald, Freddie, Shepherd, Deshone and the man with braids went into Freddie's house. Gerald and Freddie's wife then came out and said they were taking Villarreal's car to park it somewhere else. After they returned, they told Villarreal that they had parked it at a nearby bar. Villarreal said that he, Deshone, Gerald and Angie then began to talk and drink in the garage. At some point, Villarreal went into Freddie's house to use the bathroom. Villarreal testified that when he went in he saw that the man with braids and Freddie had Shepherd in the bathroom. The man with braids had a gun to Shepherd's head and told Shepherd "if you say anything, we'll fuckin' kill you." Villarreal then went out back and relieved himself there. Villarreal said he returned to the garage and sat with the others for a while and then went to Freddie's basement and took a short nap.

When Villarreal woke up, he asked Gerald if Freddie would take him to his car. Villarreal said that Freddie told him he could not drive his car anymore under the circumstances and offered to pay Villarreal for it. Villarreal declined because it was his mother's car. Villarreal then got into Freddie's car with Freddie, the man with braids, Deshone and Shepherd and they drove to the bar where Villarreal's car was parked. Villarreal said that, when they arrived near the bar, the man with braids told him, Shepherd and Deshone to get out, get Villarreal's car, and follow him.

Villarreal testified that he, Deshone, and Shepherd walked to his car and he got in to drive. Shepherd got into the front passenger's seat and Deshone climbed into the back seat and sat somewhat in the middle, but more towards the driver's side. He then followed Freddie's car to a park near the Saginaw River. After he pulled in behind Freddie, Freddie circled around and behind his car. At that point he heard a "pow" and saw Shepherd grab the back of his head. Villarreal said that, at the same time, Shepherd turned and said, "what the fuck." Villarreal then heard "pow, pow, pow, pow, rapid fire." Villarreal stated that the passenger's side front window blew out. They then ran to Freddie's car where Deshone handed his gun to the man with braids and drove away with Freddie and the man with braids.

The medical examiner testified that Shepherd was hit by two shots. One shot to the back of his head by his left ear which hit a very strong bone and stopped and a second that hit Shepherd in the head and entered his brain. The medical examiner testified that the shot behind Shepherd's left ear would not have killed him, but would have been very painful. He said that the shot that entered Shepherd's brain

3

had a slightly downward trajectory and moved to the right. This shot eventually caused Shepherd's death. Testimony also established that the passenger's side front window had been shattered and that the majority of the glass fell outside the car.

Villarreal testified that the man with braids and Freddie said they needed to get rid of the gun, which Villarreal said was the same gun that Deshone used to kill Sherman. After driving a short ways, Freddie pulled over and the man with braids got out and threw the gun towards the Saginaw River. Freddie then drove them back to his house. Villarreal later led police officers to the area where the gun was thrown and the police found it. Testimony established that the gun was a nine-shot .22 caliber revolver and that it had two empty chambers and seven fired cartridges in it when it was recovered.

Villarreal stated that, at some point they decided to drive up to a local grocery store. They discussed the situation and agreed that Villarreal and Deshone would go into the store and call 911 to report that they had been carjacked at the YMCA near the park where they left Villarreal's car. Villarreal said he gave his jewelry to the man with braids to make it look like he had been robbed. After Freddie left, he and Deshone went into the store and used the payphone to call 911.

Deshone's sister Michelle testified that Deshone admitted to shooting both victims on the day after the killings and stated that he was supposed to kill Villarreal as well, but ran out of bullets. She said that Deshone told her that he fired seven shots at Shepherd. Deshone's mother also testified that he told her that he shot both victims. However, both Deshone's mother and sister also stated that he eventually said that he did not kill the victims.

The police officers investigating the shootings eventually determined that the shootings at issue were related and arrested both Villarreal and Deshone. Villarreal agreed to assist the police officers in exchange for a plea deal. At trial, defendant's theory of the case was that Deshone was an innocent bystander at the shootings; that the evidence showed only that Deshone was "merely present and didn't walk away." The jury ultimately rejected Deshone's theory of the case and found him guilty as noted above.

[1]Freddie Williams was apparently killed sometime after the events at issue.

*People v. Deshone*, No. 286417, 2009 WL 5194530, *1-2 (Mich. Ct. App. Dec. 15, 2009).

## II.  Procedural History

Petitioner was convicted by a jury in Saginaw County Circuit Court of first-degree felony murder, first-degree premeditated murder, two counts of felony firearm, carrying a concealed weapon, carrying a dangerous weapon with unlawful intent, and false report of a felony.  On May 8, 2009, Petitioner was sentenced to two terms of life imprisonment without parole for each of the murder convictions, two years in prison for each of the felony-firearm convictions, two to five years in prison for carrying a concealed weapon, two to five years in prison for carrying a dangerous weapon with unlawful intent, and two to four years in prison for falsely reporting a felony.

He filed an appeal of right in the Michigan Court of Appeals raising these claims:

I.  The trial court erred in allowing Detective Robert Ruth, over the defendant's objections, to vouch for the credibility of Joseph Villarreal and express his personal opinion that the defendant was guilty of the offenses with which he was charged.

II.  The trial court erred in allowing, over the defendant's objections, hearsay evidence in the form of recorded conversations and transcripts of the conversations.

III.  The trial court erred in admitting into evidence a transcript of a telephone call between the defendant and his mother because the defendant had objected to the discrepancies between the transcript and the recording from which the transcript was produced.

IV.  The defendant was deprived of his constitutional right of due process of law because the prosecutor failed to disclose a recorded conversation between defendant and his mother on a timely basis and the trial court did not provide any remedy when it could have done so by granting a short continuance.

The Michigan Court of Appeals reversed Petitioner's convictions on the ground that the trial court improperly allowed the prosecutor to introduce a tape recorded conversation between police and Petitioner's sister Rebecka, and the error was not harmless.  *People v. Deshone*, No. 286417, 2009 WL 5194530 (Mich. Ct. App. Dec. 15, 2009).

The State appealed to the Michigan Supreme Court.  The Michigan Supreme Court held that

the trial court's admission of the tape-recorded conversation between the defendant and Petitioner's sister was harmless error. The Michigan Supreme Court reinstated Petitioner's convictions and sentences. *People v. Deshone*, 486 Mich. 938 (Mich. 2010).

Petitioner then filed the pending habeas corpus petition. He raises the same claims raised in state court.

### III. Standard

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting

*Williams*, 529 U.S. at 413). However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 789 (2011), (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams,* 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v.*

7

*Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a federal habeas court must presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV. Discussion

### A. Prosecutorial Misconduct Claim

Petitioner's first claim alleges that the prosecutor committed misconduct in his examination of prosecution witness Detective Robert Ruth. Petitioner argues that Detective Ruth was improperly permitted to vouch for the credibility of a key prosecution witness, question Petitioner's credibility, and express his personal belief in Petitioner's guilt.

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Parker v. Matthews*, — U.S.—, 132 S. Ct. 2148, 2153 (June 11, 2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id., quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). This Court must ask whether the Michigan Court of Appeals' decision denying Petitioner's prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 2155, *quoting Harrington*, 131 S. Ct. at 786-87.

Prosecutors may not vouch for a witness's credibility. Prosecutorial vouching and an

expression of personal opinion regarding the accused's guilt "pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

The Michigan Court of Appeals held that the testimony was not improper. The state court recognized the applicable law, including that a prosecutor may not himself or through a witness vouch for a witness's credibility or imply that he has some special knowledge about a witness's truthfulness. The prosecutor, the Michigan Court of Appeals held, fairly elicited from Officer Ruth testimony explaining why the investigation proceeded as it did, and his opinion based upon his significant law enforcement experience. Moreover, the Michigan Court of Appeals held that even if this testimony was improper, it did not prejudice Petitioner nor impact the fairness of the proceedings.

"[T]he *Darden* standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations.'" *Parker*, — U.S. —, 132 S.Ct. at 2155, (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Michigan Court of Appeals reasonably disposed of Petitioner's claim. It was not improper for the prosecutor to elicit Officer Ruth's explanation of how he investigated the crime and why he chose to pursue certain leads over others. The prosecutor did not imply that he or Officer Ruth had some special information about the police officers' testimony or credibility. Even if the court of appeals erred, habeas relief would be denied because the court of appeals' decision was not "so lacking in justification that there was an error

9

well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S., at —, 131 S. Ct., at 786-787. Habeas relief, therefore, is denied.

## B. Confrontation Clause Claim

In his second claim, Petitioner argues that his rights under the Confrontation Clause were violated by the admission of certain audio recordings and transcripts. Specifically, Petitioner argues that the trial court erred in admitting: (1) audio recording of a telephone conversation between Petitioner and his mother; (2) audio recording of a police interview with Petitioner's sister, Michelle; and (3) audio recording of police interview with Petitioner's sister Rebecka.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The Sixth Amendment's right of an accused to confront the witnesses against him is ... a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The rights of confrontation and cross-examination "have ancient roots" which the "Court has been zealous to protect ... from erosion." *Id.* at 404–05 (internal quotation omitted). The right to a trial by jury is predicated upon the belief "'that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross examination, and of counsel.'" *Id.* at 405, *quoting Turner v. State of Louisiana*, 379 U.S. 466, 472–73 (1965).

In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held that out-of-court statements that are testimonial in nature are barred by the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity for cross-examination regardless

of whether the trial court finds the statements to be reliable. In this case, both Petitioner's sisters and mother testified at trial and were cross-examined by Petitioner's attorney. "[N]one of [the Supreme Court's] decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial." *California v. Green*, 399 U.S. 149, 161 (1970). On the contrary, "where the declarant is not absent, but is present to testify and submit to cross-examination, our cases, if anything, support the conclusion that the admission of [the witness's] out-of-court statements does not create a confrontation problem." *Id.* at 162. This rule remains intact after the *Crawford* decision. *Crawford*, 541 U.S. at 59 n. 9.

Because Petitioner's sisters and mother testified at trial and were subject to cross-examination, the state court's admission of these witnesses' prior out-of-court statements was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

### C. Recorded Phone Conversation Between Petitioner and His Mother

Petitioner's third and fourth claims for habeas relief focus on a recorded telephone conversation between Petitioner and his mother, Kimberly Kohn. The conversation occurred while Petitioner was incarcerated awaiting trial in this case. According to the transcript cited by the Michigan Court of Appeals, Kohn tells her son that he needs to start communicating with his lawyer and that she has been telling his lawyer that another person did the shootings:

> [Kohn]: I said, well every time I talk to Matt he tells me I can't say this person's name and I can't say that person's name. And he said, you know what you better start fucking naming some names.
>
> [Deshone]: I told him.
>
> [Kohn]: He said ... ooh. This is not looking good at all.
>
> [Deshone]: I know ma I'm done. That's all there is to it basically I'm ... I'm ... this is a wrap for me, sorry. I'm done. I'm just ... I mean it's . . . over

|          |                                                   |
|----------|---------------------------------------------------|
|          | for me.                                           |
| [Kohn]:  | Matt why did you lie to me? I told you don't lie. |
| [Deshone]: | I did it mom.                                   |
| [Kohn]:  | What?                                             |
| [Deshone]: | I did it mom.                                   |
| [Kohn]:  | Oh my God!                                        |
| [Deshone]: | I didn't lie to you ma.                         |
| [Kohn]:  | We're gonna have to take a plea.                  |
| [Deshone]: | They're ain't no plea to take.                  |

*Deshone*, 2009 WL 5194530 at *5.

Petitioner argues that the prosecutor improperly failed to disclose the existence of this recording until the sixth day of trial in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). He also argues that the trial court erred in admitting a transcript of the recording because the parties did not agree on the accuracy of a portion of the transcript: Petitioner argued that he did not actually say "I did it," but rather that he said, "I didn't do it." Petitioner also claims that admission of this conversation violated the Confrontation Clause. That portion of this claim is discussed above.

The *Brady* disclosure doctrine requires the government to disclose exculpatory evidence to a defendant if it is "material either to guilt or to punishment." *Id.* at 87. But, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Ross*, 703 F.3d 856, 881 (6th Cir. 2012) (internal quotation omitted). If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs unless the defendant can demonstrate prejudice. *Id.* at 881-82. The Michigan Court of Appeals held that the

late disclosure of the recording did not prejudice Petitioner:

> Deshone's trial counsel effectively examined Kohn about the substance of the conversation and made the jury aware that the recording could be interpreted differently from the manner suggested by the prosecution in its transcript. This cross-examination focused the jury's attention on the recording over the transcript and was especially effective in light of the remaining portions of the recorded conversation, which could be understood to show that Deshone might be covering for someone else. Deshone's counsel also raised the matter again in closing and told the jury they should disregard the transcript because it did not accurately reflect the fact that Deshone actually told his mother that he did not do it. In addition, there is also no indication that Deshone and his trial counsel were not actually aware of the fact that the jail routinely recorded Deshone's conversations; and if Deshone or his trial counsel were aware that the jail routinely recorded Deshone's conversations, Deshone could not be prejudiced by the prosecutor's failure to remind Deshone of that fact.

*Deshone*, 2009 WL 5194530 at *7.

This Court must defer to the Michigan court's holding unless the decision unreasonably applies clearly established law as set forth by the United States Supreme Court or is based upon unreasonable determination of the facts. It is clear from the record that Petitioner was not prejudiced by the late disclosure. Defense counsel effectively cross-examined Kohn on the contents of the recording and deftly elicited testimony from Kohn to support the defense's interpretation of the recording. There is no indication in the record that counsel was unprepared to effectively question the witness, and Petitioner has failed to indicate how earlier knowledge would have led to a more effective cross-examination. The Court finds that the state court's conclusion was reasonable and the Court's confidence in the outcome of the trial is not undermined by the prosecutor's failure to disclose information sooner.

Petitioner also argues that it was error for the trial court to admit a transcript of the recording when the parties disputed the transcript's accuracy. "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the

prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994). In this case, the Michigan Court of Appeals held that the trial court did not err in admitting the transcript. The Michigan Court of Appeals reasoned that the trial court properly cautioned the jury that the transcript was not evidence and that if the jurors found a discrepancy between the transcript and the recording the jurors should rely on the recording. The trial court also permitted the parties to explore the accuracy of the transcript and defense counsel cross-examined Kohn at length about several different possible interpretations of the recording. Petitioner has failed to show that allowing the jury to review the transcript violated any right under the Constitution or denied him his right to a fair trial. Habeas relief is denied on this claim.

Finally, Petitioner argues that the trial court should have granted a continuance when the recording's existence was disclosed. The Supreme Court has recognized that "broad discretion must be granted trial courts on matters of continuances; only an unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" will violate a defendant's rights. *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (internal quotation marks and citation omitted). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Petitioner has not identified and the Court is aware of no Supreme Court authority holding that a trial court has a duty to *sua sponte* grant a continuance when there is a delayed disclosure of evidence. Accordingly, the state court's decision that the trial court did not err in failing to grant a continuance that was never requested was not contrary to or an unreasonable

application of clearly established Supreme Court precedent.

### D. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted). In this case, the Court concludes that reasonable jurists would not debate the conclusion that the petition fails to state a claim upon which habeas corpus relief should be granted. Therefore, the Court will deny a certificate of appealability.

### V. Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus and a certificate of appealability are DENIED and the matter is DISMISSED WITH PREJUDICE.

IT IS ORDERED.

> S/Lawrence P. Zatkoff
> HON. LAWRENCE P. ZATKOFF
> UNITED STATES DISTRICT JUDGE

DATE: April 8, 2014